UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DALE WOOD, )<br>)<br>            Plaintiff ) <br>) <br>v. ) <br>) <br>MAINE DEPARTMENT OF ) <br>CORRECTIONS, et al., ) <br>) <br>            Defendants ) | Civil No. 06-156-B-W |

*Recommended Decision on Unopposed Motion for Summary Judgment*

Dale Wood, an inmate at the Maine State Prison, initiated a civil action complaining that he is no longer allowed to practice Asatru religion or have any religious materials at the prison, although he had been so allowed in the past. The defendants have filed a motion for summary judgment (Docket No. 23) to which Wood has not responded. I recommend that the court grant the motion for summary judgment because, Wood not having placed their material facts in dispute, the defendants have established that they are entitled to judgment as a matter of law.

*Discussion*

*Summary Judgment Standard*

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" United States v. Union Bank For Sav. & Inv. (Jordan), 487 F.3d 8, 17 (1st Cir. 2007) (quoting Federal Rule of Civil Procedure 56(c)). I draw all reasonable inferences in favor of Wood, but where he bears the burden of proof, he

"'must present definite, competent evidence' from which a reasonable jury could find in [his] favor." Id. (quoting United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992)).

Wood has not presented any evidence in defense of the motion for summary judgment. However, this court,

> may not automatically grant a motion for summary judgment simply because the opposing party failed to comply with a local rule requiring a response within a certain number of days. Rather, the court must determine whether summary judgment is "appropriate," which means that it must assure itself that the moving party's submission shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also* Advisory Committee Note to Rule 56 ("Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.").

NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 7 -8 (1st Cir. 2002)

*Undisputed Material Facts*

Gerald Willey is a sergeant at the Maine State Prison and has been since July 16, 2001. (SMF ¶ 1.) In his current position, Sergeant Willey is assigned to the Security Operations Unit. (Id. ¶ 2.) Sergeant Willey is also a member of the Security Threat Task Force, which monitors and investigates threats to prison security by gangs and other organized groups of prisoners. Sergeant Willey has been on that Task Force since September 2005. (Id. ¶ 3.) One of Seargeant Willey's duties as a sergeant is to oversee the periodic search of lockers used by the various prisoner groups, including the religious groups. (Id. ¶ 4.)

On February 20, 2006, Officer Wigdzinski informed Sergeant Willey that when he searched the Asatru group locker, he found some "weird" items, and that he might

2

want to check it for himself. (Id. ¶ 5.)  When Willey began searching the locker, he saw a paper with some writing on it and a symbol on the lower left side that he later found, through research, was a symbol of the Aryan Nation, a white supremacist group. (Id. ¶ 6.) Sergeant Willey's research consisted mainly of searching the Anti-Defamation League website for information about white supremacist and hate groups and the symbols of membership in those groups. (Id. ¶ 7.) Once Willey saw the writing with the Aryan Nation symbol, he decided to investigate the rest of the contents of the locker, and he emptied the locker and examined the contents. (Id. ¶ 8.)

Sergeant Willey found crude banners or flags made by the Asatru members, many of which, according to the research he had done, depicted Aryan, or white supremacist, symbols. (Id. ¶ 9.)  Prior to this time, Sergeant Willey, as well as other prison staff, thought that the Asatru group was a religious group. (Id. ¶ 10.) The locker also contained some group meeting attendance sheets and a copy of a letter from Dale Wood to Assistant Superintendent Leida Dardis in which he refers to himself as the "gothi," or leader, of "my religious group." (Id. ¶ 11.) Willey also found pictures of Hitler and an envelope full of other materials that had a swastika drawn on the back flap. (Id. ¶ 12.)

The writings Willey found in the locker were neo-nazi, white supremacist in nature, and many, including the Ten Commandments for Wotansvolk, or for Aryan Man written by David Lane, advocated violence for the purpose of attaining white supremacy. (Id. ¶ 13.) A profile of David Lane on the Anti-Defamation League website indicated that he was a member of and organizer for the Ku Klux Klan, the Aryan Nation, and other white supremacist groups. In the mid-80's, he helped organize a terrorist group called the Bruder Schweigen (The Silent Brotherhood), which later became known as the Order.

The Order embarked on a crime spree that included bank robbery, counterfeiting, assault, and murder. David Lane was tried and convicted of conspiracy and racketeering and for violating the civil rights of Alan Berg, a Jewish radio talk-show host, whose murder he conspired to commit. Mr. Lane continued his white supremacist writings through the 14 Word Press from prison for some time and died in prison in 2007. (Id. ¶ 14.)

Another writing Sergeant Willey found in the locker written by David Lane indicated that the Asatru "religion" name could be used interchangeably with Wotansvolk, or Wotan, because, Lane stated "W.O.T.A.N." was a perfect name for the religion, as it's use as an acronym stood for "Will of the Aryan Nation." (Id. ¶ 15.) Yet another publication of Mr. Lane's found by Sergeant Willey in the locker, a "Focus Fourteen" publication, glorified the "14 words," which are: "We must secure the existence of our people and a future for White children." The publication also contains material that encourages contempt and denigration of other races. (Id. ¶ 16.)

After he had the opportunity to review the entire contents of the locker, and based upon his research and consultation with other prison officials, both in and out of state, Sergeant Willey determined that the Asatru group at the Maine State Prison was really a white Supremacits, neo-nazi group rather than a religious group. (Id. ¶ 17.) Sergeant Willey then reported his findings to Deputy Warden O'Farrell, who asked Willey to put his findings in a report, which Willey did on February 21, 2006. (Id. ¶ 18.) Deputy Warden O'Farrell instructed Sergeant Willey to confiscate and secure the Asatru locker and its contents as a result of Willey's report. (Id. ¶ 19.)

In addition, Deputy Warden Dardis informed Asatru group members that because of the violent and racist nature of the materials found in the Asatru locker and the risk

they created to institutional safety, the Asatru group's locker privileges were rescinded and the Asatru group was disbanded. (Id. ¶ 20.) The confiscation of materials was done in accordance with Policy 21.2, which prohibits prisoners from having materials that promote hate, violence, or bias. (Id. ¶ 21.)

*Recommended Disposition*

Although Wood did not identify the federal right or rights he felt were violated by the defendants' actions, the defendants have reasonably assumed that the case is brought under the Religious Land Use and Institutionalized Persons Act (RLUIPA), and Wood, by not responding, has not challenged that characterization. Section 2000cc-1(a) of title 42, the key provision of RLUIPA, cautions that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
> **(1)** is in furtherance of a compelling governmental interest; and
> **(2)** is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

In setting forth their case for summary judgment, the defendants rely on Lindell v. Casperson, 360 F. Supp. 2d 932 (W. D. Wis. 2005). As relevant to Wood's action, the plaintiff in that case contended "that although defendants banned his religious texts because they promote white supremacy, purity or violence," the defendants allowed "inmates access to the Bible and Koran, which promote murder." (Id. at 954.)

The Court reasoned:

> "[P]rison security is a compelling state interest." Sasnett v. Sullivan, 91 F.3d 1018, 1023 (7th Cir.1996). A ban on religious texts or practices that promote racism serves a compelling interest, Lindell v.

5

> McCallum, 352 F.3d 1107, 1110 (7th Cir.2003) (Wisconsin prison authorities may demonstrate compelling interest in suppressing Wotanism if religion is racist), and is a "legitimately restrictive means" in furthering that interest. United States v. Israel, 317 F.3d 768, 772 (7th Cir.2003) (demanding convicted felon on parole to abstain from marijuana use is legitimately restrictive means for safeguarding compelling interest in preventing drug abuse) (emphasis added).
> ….
> …[A]llowing an inmate to possess the books at all would permit other inmates to observe plaintiff with these texts, assume that he is a white supremacist who advocates violence against them and act accordingly. It is undisputed that permitting a religious group that advocates racial purity to exist in the prison setting would create a perception among minority inmates, staff, visitors and members of the public that defendants endorse these repugnant beliefs.

Id. at 954-55.  This decision was affirmed in a "nonprecedential disposition," in which the Seventh Circuit indicated: "The district judge's painstaking analysis is sound, and we have nothing to add to it except to note that any residual doubt about the lack of merit of Lindell's religious claims has been dispelled by our recent decision in Borzych v. Frank, 439 F.3d 388 (7th Cir.2006)."  Lindell v. Govier, No. 05-2772, 2006 WL 616011, *1 (7th Cir. Mar. 13, 2006).

Seventh Circuit Court of Appeal Judge Easterbrook, writing for the Borzych v. Frank, 439 F.3d 388 (7th Cir. 2006) Panel, addressed a claim brought under RLUIPA by an inmate who practiced Odinism, "which like Asatru and Wotanism entails the worship of Norse gods." Id. at 390.  The defendant contended that the books were non-religious and promoted white-supremacist violence.  Id.

The Panel rejected the plaintiff's RLUIPA claim, reasoning,

> the record establishes that the prison system's ban is the least restrictive means to promote a compelling state interest in safety. Borzych does not seriously contest the district court's conclusion that these books advocate violence. An interest in curtailing violence within prison walls is compelling. Borzych asserts that the warden has exaggerated the security concerns, but a prisoner's view of what promotes prison security is hardly

> objective. Borzych maintains that the prison has excluded these books simply because they endorse white-supremacist views, but this misstates Wisconsin's position. Defendants' principal argument is that the books promote violence to exalt the status of whites and demean other races; it is the means rather than the underlying racist view that the defendants contend (and we hold) may be forbidden in prisoners' reading matter.

Id. at 390-91.

Wood does not contest the facts material to the defendants' characterization of the Asatru religion as practiced by Wood as one that advocates white supremacy and encourages contempt and denigration of other races or that he followed David Lane who advocated violence for the purpose of attaining white supremacy and condoned terrorist type activities to obtain this purpose. Compare Gordon v. Caruso, No. 1:06-cv-571, 2007 WL 2571982, *2 (W.D. Mich. Sept. 4, 2007).[1]

Accordingly, based on the undisputed material facts and the RLUIPA precedent cited above, I conclude that the defendants are entitled to summary judgment.

## *Conclusion*

For these reasons, I recommend that the Court grant the defendants' motion for summary judgment (Docket No. 23).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

---

[1] In Lindell v. McCallum, 352 F.3d 1107 (7th Cir. 2003) the same plaintiff as in the district court case relied on by the defendants, survived a motion to dismiss, Circuit Court Judge Posner having concluded that he stated a claim under RLUIPA. Of course, Wood's case, like the district court's Lindell and the Seventh Circuit's Borzych, is set for disposition on a summary judgment record.

   Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

October 25, 2007.             /s/Margaret J. Kravchuk
                     U.S. Magistrate Judge